This is United States v. Baraloto, and the first attorney who's going to speak on his behalf is Mr. Levin. Mr. Levine, Your Honor. Mr. Levine. I'm not having a bad morning. We're glad to have you, sir. Thank you, Your Honor. May it please the Court. My name is Stephen Levine, and I represent Jared Baraloto. My colleague, Michael Pusateri, will be addressing this Court in rebuttal. This Court should vacate the conviction below for three reasons. First, the District Court committed error on numerous occasions by allowing lay witnesses to give opinions that lacked foundation and that only expert witnesses could have offered under Rule 702. These opinions were the government's primary weapon for proving the central material fact that Mr. Baraloto knew that the items were stolen. Second, the government misstated its burden on four occasions and told the jury in closing argument that it could use, in essence, a negligence standard in order to convict Mr. Baraloto. And third, the evidence was not sufficient to convict Mr. Baraloto. Addressing first the issue of the improperly admitted statements, this testimony should not have been admitted through lay witnesses who either offered no basis for their conclusions. In effect, these were conclusory statements based on subjective belief and therefore were not competent opinions. Or in other cases, they relied on their specialized knowledge of the industry. These opinions were elicited so that the government could argue and did argue that the goods were stolen and that a reasonable person would have known that the goods were stolen. The jury's verdict was substantially swayed by this improperly elicited testimony. Despite the introduction, or rather the interception, of over 7,000 phone calls, search warrant evidence, poll camera video, surveillance video, telephone records, financial records, and the testimony of eight cooperating witnesses, there was no direct evidence that Mr. Baraloto knew that these items were stolen. What did the government have? They had the impermissible 701 testimony, and this was the bedrock of their argument that they used both in their first closing and their rebuttal argument. Those arguments included, quote, at Joint Appendix 1812, these are not people who are going to have the discipline to clip hundreds of coupons from the newspaper and drive to dozens of stores in order to take advantage of buy one, get one free offers. And that argument was a reference to Mr. Stahl's testimony where he talked about the types of people who he saw going into pawn shops. And he went on to describe those types of people as, quote, two Afro-Americans who called themselves brothers. Then he said, I don't know if they were brothers or not, and that's a quote. Other arguments that the government introduced during its closing, quote, there was no way the boosters were couponing. It's impossible. It doesn't happen. It has no basis in reality. This argument was based on impermissible testimony by witnesses who had no basis to make those statements. The government further argued that the removal of the stores identifying information from the goods would be, quote, a tip-off that they were stolen. Again, that was based on impermissible testimony. And finally, in its closing, the government argued, quote, you don't get that kind of volume driving around clipping coupons and going to different stores to get buy one, get one free. You can't get that kind of volume that way. There was no permissible testimony to determine what kind of volume can sustain the secondary market that would have made its way into the pawn shop. There were other arguments that the government used based on improper testimony. At Joint Appendix 1811, this neighborhood was not where an honest person would necessarily go to choose to do business. In addition to using that improper opinion testimony, the government misled the jury, contrary to what it said it would do in its pretrial response motion. The government argued that Mr. Barilato's reaction in the four days after arrest tape is not that of an innocent person because he didn't say certain things. In fact, he had said those things in an earlier call, call 2196, but the government had successfully fought to exclude that tape as substantive evidence. Mr. Levine, let's back up just one minute to the lay witness opinion testimony. You know, when I was reading this, I mean, I just had such a strong gut reaction that it can't be right to let this kind of evidence in. And that's based on my training in Virginia where this would never have gotten in. Okay? But then, you know, as I was reading the cases that govern this, looking through the elements here of under Rule 701, you know, it looks like maybe my gut reaction was wrong. So could you walk us through the elements of Rule 701 and tell us why they were not met in this case to permit this kind of testimony? Certainly, Your Honor. I think Your Honor was right with the gut reaction, I must say. You'll just let it stop right there, won't you? Settle for that. Your Honor, if I may just reference, there are several examples. Michael Ender's testimony. Right, but my question, I don't mean to cut you off, but what I'd really like you to do is to walk through the rule itself and say why, for example, the testimony was not rationally based on the witness's perception, why it was not helpful to determining a fact and issue. Take the elements of the rule and tell us why they were not met in this case in order to permit testimony. Certainly, Your Honor. So it has to be rationally based, based on firsthand knowledge. It has to be helpful. That's 701B. And then 701C can't rely otherwise on scientific, technical, or specialized knowledge. And so when you have a witness testify that boosters come into the pawn shop, which is one example, we have to know what that's based on. We can't just let that in without a proper foundation having been laid. We don't have any way to measure whether or not it's rationally based unless we're provided with some information on what that opinion is based on. And that wasn't the case here. These were conclusory statements. So then are you saying if the witness testified, I was in the store for a period of nine hours and I observed people come in and they were disheveled in appearance, they were pulling stuff out of bags that were not marked, that were from all different random sources, I never left the post for nine hours, and watching the people who came in and their apparent physical problems, whatever, whatever, I concluded that these were stolen. Would that have been admissible? No, Your Honor, because that's not rational. What would be admissible is if the individual had testified that he observed the theft and then he observed the so-called boosters come into the pawn shop. He observed the theft? That would be one example. Well, if he observed the theft, he wouldn't need any opinion. Well, his opinion would be that boosters were coming into the pawn shop. That would be his opinion, that he observed these individuals steal from the stores and then he later observed these same individuals going into the pawn shop. That would be one example. If he had heard the boosters in the pawn shop talk about that they had stolen merchandise, then his opinion would be that these were boosters, and that could be rationally based. But there was no basis for this conclusion. It was nothing more than boosters came into Fast Money without explaining how he knew, if he did know, that these customers were, in fact, shoplifters. Mr. Levine, I guess your argument is that you can't say this person looks like a thief. But that's what they did over and over again, Your Honor, and that's the trouble. So you're saying you're not contesting the admissibility of lay opinion evidence that items were stolen. You're really challenging the foundation for the lay opinion in this particular case. Is that a fair statement? Yes, Your Honor. There were so many lay opinions offered with respect to the stolen nature of these items that, of course, the jury was substantially swayed by this improper evidence. Over and over again, we heard argument and testimony about the types of people who came into the pawn shop, about the type of neighborhood, and that no honest person would do business. Was there evidence about the price that paid for the products? Yes, Your Honor. There was evidence that the prices that were paid for these items were lower than you would find in the retail stores. And, of course, that's common sense because, as this court recognized in the EPRT decision, common sense dictates that if there is a market for salvaged or liquidated over-the-counter or health and beauty aid items, the price of those goods in that market would necessarily be below the price that retailers pay wholesalers for the same goods. Otherwise, there would be no secondary market. But there's a lot of information about price being low, right? Yes, Your Honor. And you're saying that that doesn't necessarily mean it's stolen. It could have been liquidated. Was there any evidence it was from a liquidation sale or bankruptcy or something? Well, there was certainly evidence introduced into the record that there is the existence of the secondary market and the burdens on the government to prove that if the government's relying on volume or price as indicated. There needs to be a rule that you can get a jury to conclude from the possession of stolen property or possession of property that was obtained by a low price and all the factors that the jury is entitled to conclude and decide whether it's stolen or not and whether the possessor knew it was stolen. What makes this case different, Your Honor, is that there are several legitimate explanations for the source of those items. And somebody's entitled to explain it. That's right. And explained possession might rebut the permissible inference. But what the government has to do is make a prima facie case enough to get to the jury. And if the jury finds against you, puts the defendant in a tough spot because of the standard of review. But the testimony with respect to the volume and the low cost and the packaging and the stickers and the cleanup operation was inadmissible evidence because it was based on either no foundation or it fell into the camp of specialized knowledge for which expert notice should have been given. And that's why the government was able to argue that the volume meant that it was stolen. And that was an argument based on improper and inadmissible testimony. And so that's the problem with this case. Can we review all this for abuse of discretion? Yes, Your Honor. And because this testimony was really the bedrock of the government's case, the conclusion is that the jury was substantially swayed. The government used this information in both its first closing argument and its rebuttal. And this was a case that relied, I would say, exclusively on circumstantial evidence to try to prove Mr. Barilato's knowledge. And in a case involving circumstantial evidence, it takes- Stolen property cases are most all the time circumstantial evidence cases, aren't they? Well, Your Honor, in my experience, there's often direct testimony or there's direct evidence to establish knowledge, such as I had a conversation- It probably makes a deal with the thief or something. And that happens. Then they've got some direct testimony. Then they've got credibility issues. But in lots of instances, they're simply circumstantial evidence cases. Certainly, I would concede that there are cases involving circumstantial evidence. But in this case, we have a number of innocent factors, which the government has used to suggest suspicious circumstances. And this Court has articulated in past cases that it's troubling when the government takes innocent factors and just uses that however it wants to suggest that there was something awry. And in this case, certainly from Mr. Barilato's perspective, it appeared that this was a legitimate business. It advertised what it did, that it was a buy-sell shop and that there were customers. And there were 40,000 sheets introduced at trial, which reflected the transactions that went on between the customers and the pawn shop employees and owners. And these sheets introduced at trial went to the law enforcement officials who reviewed the sheets. And we know they reviewed these sheets to determine if any items were stolen because there were oftentimes introduced at trial police holds. So law enforcement officers identified items that they believed were stolen and instructed the pawn shop to hold those items, which they did. And Mr. Bradford testified he had gone to state court on several occasions to testify in stolen property cases. So this information gave Mr. Barilato some comfort in believing that this was a legitimate business transacting in a lawful operation. How many defendants did they prosecute here? Your Honor, I believe the government can answer it more fully. I know that there were eight cooperators who testified against Mr. Barilato. So, again, there was no direct evidence of actual knowledge that Mr. Barilato believed these items were stolen. And that's why the government lowered the burden of proof by arguing on four separate occasions that it was, in essence, a negligence standard that should carry the debt. I see my time is up, but for the reasons in our papers, we'd ask that this Court vacate the verdict below. Thank you. Thank you very much, sir. Mr. Rahman? Did I mispronounce your name also? Mr. Rahman, Your Honor. Thank you, Judge King. May it please the Court. My name is Sujit Rahman. I'm the appellate chief for the District of Maryland, appearing on behalf of the United States. I would like to begin, Your Honor, with the Rule 701 issue. Judge Keenan, I appreciate the question that you asked of my opponent about walking through the rule, because I think it's very important for this Court to do that. If the challenge is under Rule 701, that this lay opinion testimony was improperly admitted, it has to actually violate the rule. And when you look at the rule, Rule 701A, the insistence upon personal knowledge, personal observation. Judge Gregory, I know you've sat on the panel in Perkins. I think you wrote the opinion in Johnson. Two of the most recent decisions that this Court has issued in the Rule 701 context. And that is the point. There has to be some sense of personal observation, personal recognizance of what the witness is talking about. And that is certainly satisfied in this case. Every single cooperating witness who testified in this case, Jerome Stahl, Gerald Bradford, Scott Bradford, Ashley Williams, Robert Reed, the whole run of the cooperating witnesses, every single one of those persons worked at a pawn shop or owned a pawn shop and had direct interaction with the boosters who were coming in off the street, as did Mr. Barilotto, incidentally, the defendant in this case. So they were testifying about their personal experience, their personal exposure to the circumstances of the pawn shops in which they were dealing. Scott Bradford testified directly about the fact that he would have conversations with the boosters where they would talk about having where they shop, so to speak, a euphemism for where they shop left materials from. The fact that sometimes boosters were on vacation, which meant they were in prison, they were in jail because they had been picked up for retail theft offenses. So these are direct, this is direct testimony of individuals who were in the pawn shops dealing directly with the shoplifters. That testimony, that lay opinion testimony is perfectly admissible, and it was not, Judge King, an abuse of discretion for the district judge to allow a person who is on the scene directly observing what is happening in front of them and to relate to the jury what their inferences were, what their reasonable inferences were. And, of course, it's left to the jury to decide whether or not they think what the person who, the cooperating witness who testified to, what they said is reasonable. So it goes to the weight. The fact that it's before the jury was not error, and the fact that the jury convicted this defendant after having heard that testimony was perfectly appropriate. And, Judge King, as you observed earlier, the standard of review here is the abuse of discretion. Why are we on the slippery slope, counsel, though, when we say that it boils down to, though, a person looking like someone else? For example, they're drug addicts. Drug addicts pay for items in stores, too, don't they? They certainly do, Your Honor. So why is the fact that a person looks like a drug addict means that they are boosters and they stole these items? Your Honor, I have two responses to that. First of all, the testimony in this case was not that people looked like drug addicts. The testimony was that they were drug addicts. Gerald Bradford testified that he had a very close interaction with these people. These folks were actually his suppliers at the end of the day. He knew these individuals by name, and the record reflects that. He knew the fact that they had drug addictions. They had open sores on their arms. Scott Bradford testified that many of these individuals had heroin addictions. So these people, it's not that they look like drug addicts. All right, well, let's take it a step further, then. They're drug addicts. They're sick. Yes, Your Honor. So why does a person's physical maladies mean that they're crooks? It does not mean that they're crooks, Your Honor. What it does mean, and this is where I want to emphasize to the Court, this is not a circumstantial evidence case. Much of the evidence was circumstantial, but there was direct evidence in this record that these items were stolen. Amber Booth was a booster, self-proclaimed, a woman who had, I think, ten prior convictions for re-delivery. So there was direct evidence that was stolen. What he's saying, I thought, is that there's no circumstantial evidence that he had knowledge. Well, I think those are two different issues, Your Honor. Right. Under 23 years. You don't have any direct evidence that he knew they were stolen. Yes, we do, Your Honor. There is a wiretap in this case. And studiously, not mentioned in these cases. You say he said on there, I knew it was all stolen? When he was arrested, Your Honor, four days after his arrest, and Judge Gregory, I want to make sure I answer your question, but just to answer Judge King's question, there is a wiretap in this case that lasted one month on four different lines. There were 17 defendants in this case, by the way, Judge King. Mr. Verilato is the only individual who went to trial. That's his right. On that wiretap, four days after his arrest, he says, I don't want to go to prison. He's talking to Jerome Stahl, the $28 million man. I don't want to go to prison. I can't handle prison. I want to wait until I get discovery. He doesn't say, I didn't do it. He doesn't say, Jerry Stahl, what was going on here. He says, I can't handle prison. And not only does he say that. Well, that's circumstantial evidence. Your Honor, I believe. That's your best argument. That's not a statement that I knew all this stuff was stolen and I'm guilty. It's perfectly natural he wouldn't want to go to prison. Well, Your Honor, I think if you listen to the. And it's perfectly natural he might want to wait until discovery. I mean, it's probably even thin to say it's circumstantial evidence. He might have better circumstantial evidence than that, I thought. Well, Your Honor, perhaps we could agree to disagree over whether. But the question is whether he knew of the stolen nature of what he was dealing in. And the way he knew. And the jury found he did. It did. The question is whether there's enough evidence to prove that. There is absolutely enough. And it looks to me like it's circumstantial on the knowledge point. Your Honor, the fact. It might be direct on the fact that it was stolen, but was it stolen when it was in his hand? Let's not forget that. Yes, Your Honor. This is a defendant, and the record reflects this, who was often in Fast Money Pawn Shop. I would submit if he were someone who came into the store for three minutes every day, picked up, and left, he would have a viable defense. What the facts of this case. And I would encourage the court to look at the facts. I think I've written a 50-page statement of facts in this case because the facts are so important. The facts are so important in this case. And when you look at the factual statements in this case, you will see that Mr. Barilato often hung out at Fast Money Pawn Shop. He was there directly interacting with the boosters. And he had the very same perspective on what was happening in the pawn shop as every other person working at that pawn shop. He was often on this side of the table. He was actually on this side of the table dealing with the boosters coming in, sheeting down the items on the transaction sheets, interacting with the customers. The trial evidence reflects that. I think there's over 2,500 pages of trial transcript testimony in this case. Now, I would encourage the court to go through that transcript because it's not – I feel like the argument is a little bit at the 35,000-foot level. When you look at the actual facts of this case, you see the surveillance video, which is in evidence in this court's docket. That is what Mr. Barilato was seeing every single day. And as Judge Legge, the district court, observed, his impression – not that it goes to what the jury held – his impression was if you look at that surveillance video, just one day, March 24, 2010, the day before the search warrants, you would reach the inescapable conclusion that these items were stolen. When every single day over four years, you see – That doesn't prove your case. What proves your case is that Barilato knew they were stolen, right? Yes, Your Honor. That's what you had to prove. Well – And you did. But saying we proved they were stolen doesn't prove the fact that he knew they were stolen. Well, let me get right to your point, Your Honor. How do we prove knowledge in this case? We've laid it out in our briefing. I would refer the court to page 56 of the government's brief, the red brief in this case. The direct evidence that I've talked about, I agree, Your Honor. But Mr. Barilato essentially tells his main co-conspirator, I'm not optimistic about what's going to happen in this trial. I can't go to prison. I don't remember every conversation I ever had with anybody, he says. He won't make any decisions in this case until he receives discovery. It's not, I didn't do it. I didn't know the stuff was stolen. What he said was, let me wait to see what the affidavit says before I can decide. Our submission, Your Honor, is that that is direct testimony. But if the court thinks it's circumstantial, fair enough. It is certainly a strong piece of testimony. Suppose he had said, you know, I want a lawyer on the tape in response. Would that be circumstantial evidence? Depends on the facts, Your Honor. By itself, no. By itself, I don't think that's direct knowledge. Why not? He should have said, I'm innocent according to you. Well, not necessarily. Anything inconsistent with that is circumstantial evidence that he did. Not necessarily. That's direct evidence. Yeah, direct. I think it is direct evidence. But, Your Honor, as I say, I think everything has to be considered. I don't want to go to jail. Seemed to be a pretty rational response. I think we all would agree. I think we all agree with that. I don't disagree with that. The point is within the context of the prosecution, Your Honor. Within the context of these phone calls. And as I say, there are many phone calls in this case. And then you're arguing it's circumstantial evidence. You have to look at it in context. And if you look at it in context, the inescapable inference to be drawn by the jury is that he knew it was stolen. Let's talk about that. You're arguing circumstantial evidence and you're calling it direct evidence. It is not. Let's talk about whether it's direct or whether it's circumstantial, Judge King. Let's talk about it. It's a circumstantial evidence case on the knowledge issue. Yes. And the knowledge issue is the case against this fellow. Well, proving knowledge, yes. Well, that's the whole case that's up here. Well, it's not quite. It's whether you proved knowledge. Well, you did to the jury. And so the only question is whether was there enough evidence for the jury to decide that and was, as part of that, some of it admissible or not. Yes, Your Honor. But I want to get to Judge Keenan's original question to Mr. Levine, the Rule 701 analysis here. That goes to whether or not the goods were stolen, right? Under Section 2314, the government has to prove different elements. It has to prove, first, that the goods were stolen and, second, that the defendant knew the goods were stolen. This entire Rule 701 analysis, Judge Keenan, goes to the first question, were the goods stolen? And I submit to this court, under Amber Booth's testimony, there is direct evidence. So whatever evidentiary issue the court might find, and there is none, that is our position, but even if the court finds any Rule 701 error, the direct testimony renders any error harmless. The fact that Amber Booth testified well over the jurisdictional amount of amount of goods stolen, that renders any error harmless. Because it doesn't matter what the other witnesses may have said. All right, she said she stole about $10,000 worth, right? Well, that's what she was paid. The retail value was over $30,000. All right. Now, what's the evidence that she sold at that pawn shop? Yes. All right. Yes, Your Honor. So just to get back to the original point, Judge Keenan, your question, that gets to whether or not the goods were stolen. Now, Judge King, I fully stipulate. Then the question becomes, how does the government prove that Mr. Barilotto knew the goods were stolen? We've talked about the wiretap, but let's not set the wiretap aside. We do not rest our case upon one phone call on March 29, 2010. It's a conspiracy. And so when you hear all of the phone calls that were part of this conspiracy, and the transcripts are laid out I believe starting at page 65 of the joint appendix, and they run from page 65 through page 116. When you go through those phone calls, Your Honors, you will see discussions between and amongst these co-conspirators that makes it crystal clear that they knew what was going on. There were conversations between Jerome Stahl and Mr. Barilotto in which they talk about the other pawn shops that were involved in the scheme. Now, why would Mr. Barilotto have any reason to talk about the other pawn shops that he's got nothing to do with, unless he had knowledge about the broader scope of this conspiracy? They talk about recruiting customers away, Judge Gregory, from Fast Money. And I should say, by the way, Mr. Barilotto opened up his own pawn shop, along with Jerome Stahl, the $28 million man, in early 2010. So he went from being a middleman between Fast Money and Jerome Stahl to becoming a co-owner of a pawn shop along with Mr. Stahl. And their explicit business model, Your Honors, was to try to recruit boosters, to try to recruit shoplifters away from Fast Money and from Jason Logue's store, which is another store which is around the corner. And there were many conversations. This is all in the government's brief, and it's also in the record, of course, in which Mr. Stahl and Mr. Barilotto talk about recruiting these customers away. Now, I submit to the Court that is direct evidence of this defendant's knowledge of the fact that I want to take away business from one pawn shop. Did they say, I want to take boosters away from the pawn shop? They do not use the word booster. All right, what do they use? He uses the word order. The word order, which Mr. Stahl testified, and this is in the record, was, according to the members of this conspiracy, a subset of stolen goods. Boosters would deliver orders, that's the term that they used, to the pawn shops. So that's a word that Mr. Barilotto used on a phone call in which they were discussing these items. But, again, I want to emphasize the wiretap in this case, Your Honor, because when you look at those calls, there's one call. I was talking about Mr. Barilotto's pawn shop. It's called Blue Diamond. One of the employees at Blue Diamond is a man named Warren Culver. There are many phone calls between Warren Culver and Jerome Stahl that are in evidence in this case, in which they talk about recruiting individuals to take six-hour drives, where essentially these individuals would drive around the East Coast and hit retail stores, steal items, and bring them back to the pawn shops. And Mr. Barilotto was supposed to profit from that. He was a co-owner, a co-partner in owning Blue Diamond Pawn Shop. So that's the very business model here, Your Honors. The business model is premised upon recruiting, finding these boosters, bringing them into the pawn shops, buying retail goods, new, in the box with their wrapping and their retail stickers on them, at massive discounts, usually about 33 percent of the retail price, and then passing it up the chain to Jerome Stahl. What's the street lingo terminology for a person involved in a stolen property acquisition scheme like Mr. Barilotto? It's either fence or booster, Your Honor. What you're calling the people who bring the stuff in is boosters? Boosters, correct. So you don't claim he's another booster? He's more of a fence? Well, correct. That's right. I mean, he's a businessman, essentially, unfortunately, an illegitimate businessman, but that's his role. He wasn't going out stealing stuff himself, but he knew that the entire supply of stuff coming in was stolen. The problem is I have the cases that some of the things you talked about in the conspiracy, certainly are more pointed, but you put so much in. Maybe, you know, it's the old saying, maybe you get too much. You go on further, though, and talk about drug addicts and things like that. This is a pawn shop, and pawn shops, many times, not always, but many times there were people who were poor, who were desperate, who need money. For example, I have a $10,000 ring, for example. Well, it doesn't make much sense to collateralize that for $500, but if I need $500 to keep my lights on or to put food in my refrigerator, I'll do it. But someone watching me in the pawn shop said, look, I just saw that guy, you know, the guy with the beard and the glasses came in. That was a nice ring he gave for $500. That's quite a substantial amount. But that's what pawn shops do. They're poor people who are desperate. It's a legitimate business. I have a problem with just looking at people the way they look, whether they have tracks on their arm, whether they just shovel and say, well, anybody, that's what determines you. Any rational person would know that that person stole that. That's a problem. Judge Gregory, I want to persuade you that that is not the government's position in this case. Our theory before the jury and our theory in this prosecution has never been if you just look at somebody, you know that they're a thief. The prosecution theory in this case is from the very beginning has been when you look at the volume of items. And I would direct the court to page 2248 of the joint appendix, because that's Amber Booth. She's the woman who came in and testified that I stole these items. When you look at the volume, Judge Gregory, it's not an incident of one individual coming in and pawning a necklace or pawning a wristwatch. It is massive volumes of goods. It is Tylenol. It is Prilosec. It's health and beauty items. It's not personal items of the kind that you described. It is a massive amount of health and beauty items over the course of three or four years. And the Bradford brothers testified that they knew these individuals. They were friends of theirs. These weren't just, you know, folks who were walking in on a one-off sort of situation. That was their line of work. It was boosting. It was just like Amber Booth going into a pawn shop, excuse me, going into a giant store in Pennsylvania, stealing massive amounts of Tylenol. There's a whole world out there, Judge Gregory. And I think that is what I'm perhaps trying to convey to the court. It isn't just a one-off situation where a person comes in and is somehow stereotyped, even though that's the impression that the appellant will leave in this court. That is not the situation in this case. The situation in this case is a built-in retail theft, organized retail theft conspiracy, the whole purpose of which was to manipulate drug addicts, Judge Gregory. It's not the government who is stereotyping these individuals. It's individuals like Jared Barilotto who took advantage of the drug addictions of these suppliers. There's a wiretap statement in here, Judge Gregory.  I'll refer the court very quickly just to that excerpt because I think it's very important for the court to recognize this. Mr. Barilotto snickers and he mocks a drug addict who walks into one of these pawn shops. Essentially, a young woman came in looking for needles. She needed needles for her drug addiction. She was dropping off an order at the same time. And this was fodder for Mr. Barilotto and Mr. Stahl. It was entertainment for them, Judge Gregory. For them, it was funny that this person came into a pawn shop and was asking for needles. And the pawn shop eventually threw her out because she thought she was at the wrong pawn shop. So it's not the government, Your Honor, that is stereotyping or somehow misleading the cause of justice. It's the defendant who was manipulating these innocent drug addicts, these people who had very serious drug problems, as Amber Booth testified. She would score heroin the second she left Fast Money. It's in the record. These are the people who are being manipulated by this organized retail theft scheme of which Jerome Stahl was at the very top and Mr. Barilotto was right below him. So I want to make sure the court has a very clear understanding. The government's theory in this case has never been you can look at people and stereotype them. We reject that. That is not our position. Our position from the very beginning has been if you manipulate drug addicts, if you take advantage of these poor individuals, if you take advantage of the fact that they're willing to go into stores and steal new items just so they can service their drug addictions, that is not appropriate. And more importantly, it's a violation of federal law. That is precisely what the jury found in this case. And this court, we respectfully submit, should accord that jury verdict the respect it deserves. I see my time is up, Judge King.  We appreciate it. Thank you, Your Honor. Mr. Busateri, we're pleased to hear from you, sir. Thank you, Your Honor. May it please the court. I'd just like to refer first to some of the comments that Judge Gregory had with respect to these notions of stereotyping people based on their appearances, perhaps drawing the conclusion that because somebody's a drug addict, they must therefore be a thief. Mr. Rahman noted that that wasn't a theory that the government would ever adopt. Turning to JA 1892, which was in Mr. Rahman's closing, he noted, as I was saying, look at that video with your own eyes. You'll see a parade of people. Later on, he says, anyone can look at that with their own eyes, and you'd see that they were stolen. A day earlier, Ms. Sal noted, put yourself in the shoes of the people in the pawn shops observing the customers come in. And then finally, any reasonable person sitting at Fast Money watching that parade of people would come in, at which point Mr. Levine objected, and that objection was overruled. Your Honor, I submit that, in fact, these do sort of promote those stereotypes. But more importantly, these were comments that were made during the government's closing, and, in fact, during the rebuttal portion of the closing after the defense had an opportunity to speak, and when it was clear the defense would no longer be able to speak. And really these, more importantly, though, they do represent, I think, a promotion of stereotypes. More importantly, they speak to a negligence standard, which this Court has disavowed in Campbell. Of course, we can't convict somebody based on a mere negligence standard because we can't expect that criminal defendants are rational people, which is precisely what the government advocated when they said, you jurors look at this parade of people and conclude, you would surely conclude, as any reasonable person would, that they were shoplifters. Any reasonable person would look at the volume and conclude that the items were stolen. No, that's not the standard. This is a subjective, actual knowledge standard. This is not a negligence standard. And I also submit further that many of the factors that the government cited in its concluding remarks as an indicia that these items were stolen are, in fact, common sense and completely benign factors, which this Court, again, in Foster has noted they've disavowed the practice of introducing innocent explanations and spinning them in a way that makes it look nefarious. Mr. Levine mentioned the volume. Of course, in the Eber case, it was clear that in order to make the volume comment, you need to have an expert come in and say, well, the secondary market certainly can't sustain such a volume. And, in fact, Jerome Stahl himself, through personal perception, participated in the secondary market, confirmed its existence, and noted that, yes, in fact, this is a reasonable, normal thing that does exist. He provided an anecdote about a fist fight that took place at a reclamation center that he attended, that he visited in Philadelphia. He noted that these objects, these items are in high demand because they can be turned for a substantial profit. These are innocent explanations. Likewise, the stickers, Your Honor, there's evidence from the Eber case and also things that were said by Mr. Stahl that, of course, you remove stickers in the secondary market to make items look new, to enhance their value. With respect to this point that Mr. Rahman raised about the term order, earlier in his testimony, Mr. Stahl was asked what an order was, and he said that it was merchandise. He didn't use the expression stolen. Later on, he said, I understand order to mean stolen health and beauty aids. But he didn't say that Mr. Barilotto understood that term to mean stolen health and beauty aids. And that's an important distinction. The government cites the Minn case, and in the Minn case, the district court gave very specific, complimented the government for making very specific questions. I guess the expression was, take him out. And the witness said, yes, in fact, he meant we're going to kill somebody. That wasn't the question that was asked of Mr. Stahl, and that wasn't the testimony that was provided. Mr. Stahl said, I believe the term order to mean stolen health and beauty aids, even though earlier he said, I believe order to mean merchandise. Then he said sort of more broadly, order means stolen health and beauty aids. He didn't say Mr. Barilotto understood order to mean that. And I think the only other point that I would raise is with respect to this harmless error issue, the impermissible 701 testimony dressed in, the expert testimony that was dressed in lay witness clothing that was allowed in, is especially problematic in this case because I believe, as Judge King, as you noted, this really was a circumstantial evidence case. It was not a direct evidence case. And when the government's proof relies primarily on circumstantial evidence, we have to be particularly careful with trial evidentiary errors like this, and we have to accord them more significance. As the court in Dietrich, the Second Circuit Court of Appeals noted, it takes less to tip the scales in these circumstances. It takes less to conclude that something was not a harmless error when the government's case is based exclusively, as Judge King pointed out, on circumstantial evidence. I see my time is up. Thank you very much. Thank you. We'll come down and greet counsel.
judges: Robert B. King, Roger L. Gregory, Barbara Milano Keenan